J-S39026-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WILLIAM FRANK STRINE | : | |
| | : | |
| Appellant | : | No. 492 MDA 2022 |

Appeal from the Judgment of Sentence Entered October 12, 2021
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002304-2020

BEFORE: PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 09, 2023**

William Frank Strine ("Appellant") appeals from the judgment of sentence of 72 hours to 6 months' incarceration, imposed after he was convicted of one count of driving under the influence ("DUI").[1] Appellant alleges the verdict was against the weight of the evidence. We affirm.

We reproduce the Commonwealth's factual summary of the incident which led to Appellant's conviction:

> On January 6, 2020, Officer Steven Knickel was out on patrol in Northern York County. Officer Knickel noticed a vehicle heading north[,] swerving across the lanes, going onto the shoulder of the roadway multiple times[,] and failing to use any signals for lane changes. The vehicle then sped up to what the officer estimated to be 92 miles per hour, in a 55 mile per hour zone.
>
> Officer Knickel subsequently pulled the vehicle over; upon approach, the officer had to instruct the driver to place the vehicle in park. It was determined that [Appellant] was the driver and

---

[1] 75 Pa.C.S. § 3802(d)(2).

sole occupant. [Appellant] was jittery, talkative, and "all over the place;" he also exhibited some paranoia. When asked if he was under the influence of drugs or alcohol, [Appellant] acknowledged that he had prescriptions for Suboxone and Adderall. [Appellant] advised he had taken his Suboxone earlier in the day and then indicated he actually had another prescription, mumbling "something about Oxycodone."

[Appellant] was then asked to exit the vehicle. His movements were very uncoordinated, and he appeared unsure of his footing. The officer had [Appellant] perform standard field sobriety tests on the side of the road, which was flat and level; there were no adverse weather conditions at the time and traffic was light. During the Modified Romberg test, [Appellant] exhibited a sway side to side or forward to backwards and estimated 30 seconds at 20 seconds. [Appellant] next attempted the walk and turn test; he had an extremely difficult time just getting into starting position, with Officer Knickel describing his efforts as looking "like an individual walking a tight rope." [Appellant] was unable to stay in the instructional position, leaving it multiple times and using his hands for balance. The test was stopped almost as soon as [Appellant] began it to ensure no one would get hurt due to the severe issue he was having trying to complete the test. [Appellant] next attempted the one-leg stand test. During the test, he used his arms, had extreme difficulty getting into position, put his foot down, hopped, and failed to follow directions by putting his hands in front of himself rather than down at his sides.

Following [Appellant's] failure to successfully complete the standardized field sobriety tests, Officer Knickel contacted the Harrisburg barracks for an on-duty Drug Recognition Expert (DRE). [Appellant] indicated he was willing to meet with the DRE and do some additional tests, so the officer transported him to the Harrisburg barracks, arriving about 4 a.m., roughly an hour after the initial stop. The DRE performed "most of those same tests again in a controlled-level environment in a room at the Harrisburg station[,]" as well as an additional "finger-to-nose" test. At the conclusion of the testing, Officer Knickel believed [Appellant] to be impaired. When asked, [Appellant] agreed to submit to a blood test, which was completed at 5:34 a.m.

Commonwealth's Brief at 6-8 (citations to record omitted).

The Commonwealth further summarized the procedural history of this matter as follows:

> On February 10, 2020, [Appellant] was charged by the Pennsylvania State Police with [DUI] and attendant traffic summaries for [the] incident that occurred on January 6, 2020. The charges were held for court following a preliminary hearing on June 15, 2020. [Appellant] was then formally charged by Information on July 9, 2020, with two counts of DUI, both graded as ungraded misdemeanors, and four traffic summary offenses.
>
> A non-jury trial was held on … July 29, 2021. Following testimony, [Appellant] was convicted of one count of [DUI,] as well as the four traffic violations. He was then sentenced on the DUI to 72 hours to [6] months in York County Prison, payment of court costs and a $1,000 fine, and completion of DUI conditions; he was ordered to pay a fine and court costs on each summary offense.
>
> On October 22, 2021, [Appellant] filed a post-sentence motion; the sole claim raised was that his verdict was against the weight of the evidence. The [trial] court then denied [his] motion on February 22, 2022.

*Id.* at 5 (unnecessary capitalization omitted).

On March 24, 2022, Appellant filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed its Rule 1925(a) opinion on the same day, in which it incorporated its February 24, 2022 opinion in support of its order denying Appellant's post-sentence motion. On appeal, Appellant presents the following, sole issue for our review: "Whether the trial court abused its discretion when it held the verdict was not against the weight of the evidence where the greater weight of the evidence showed [Appellant] was not impaired by Adderall consumption and the trial court's decision was manifestly unreasonable[?]" Appellant's Brief at 4.

- 3 -

We review a weight of the evidence claim according to the following standard:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [fact-finder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the … verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Tejada*, 107 A.3d 788, 795-96 (Pa. Super. 2015) (citation and brackets omitted).

Instantly, Appellant claims his DUI conviction was against the weight of the evidence, which he maintains "demonstrated [his] driving was due to his belief he was being followed" — not impairment by Adderall consumption — and that "[h]is performance on the field sobriety tests was due to environmental factors, his anxiety, and his footwear." Appellant's Brief at 15-16. Appellant explains that "his weaving and increased speed were attempts to verify [his] belief" that someone was following him. *Id.* at 21. He states that the evidence establishes he was, in fact, being followed at the time he was pulled over — albeit by the police — and that it was his belief that he was being followed — not his Adderall consumption — that caused him to violate numerous traffic laws. *Id.* at 22. Additionally, Appellant asserts that the field

- 4 -

sobriety tests were not developed to determine Adderall impairment. *Id.* at 16.

In support of his argument, Appellant points to the testimony of Dr. Guzzardi, an expert in medical toxicology. Dr. Guzzardi indicated that Appellant has a chronic paranoid personality and that his "unusual thought processes … are independent of the use of amphetamine[,] which is prescribed for [Attention Deficit Hyperactivity Disorder ('ADHD')]." *Id.* at 18 (citation omitted). Dr. Guzzardi also asserted that the field sobriety tests administered on Appellant were not validated to test for impairment due to an amphetamine. *Id.* at 23 (citing Appellant's Exhibit 1 at 11-12 (Dr. Guzzardi's Expert Report concluding that neither the walk and turn test or the one-leg stand test are able to measure impairment by drugs)). He concluded, "there is no evidence that indicates … [Appellant's] use of amphetamines caused any impairments that could be significant enough to affect his ability to safely drive a motor vehicle." *Id.* at 19.

The trial court did not find Dr. Guzzardi credible, however, and stated that his contention regarding the lack of evidence to establish Appellant's impairment by Adderall consumption was "wholly without merit and belied by the other evidence of record." Trial Court Opinion ("TCO"), 2/24/22, at 8, 10. The court also opined that it did not find Appellant's excuses for his erratic driving and his poor performance on the field sobriety tests to be credible. *Id.* at 2 (dismissing Appellant's excuses that he was feeling anxious because he believed someone was following him, that he was changing lanes to confirm

- 5 -

this belief, and that environmental conditions affected his ability to perform the sobriety tests).

In support of its denial of Appellant's post-sentence motion, the trial court explained:

[Appellant] was convicted of DUI under Subsection 3802(d)(2), which provides, in pertinent part:

**(d) Controlled substances.** – An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances: …

(2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual physical control of the movement of the vehicle.

75 Pa.C.S. § 3802(d)(2). Pursuant to this statute, whether or not the amphetamine in [Appellant's] system was the result of prescription medication he was taking, and whether or not [Appellant] was taking the prescribed dosage for that medication, has no bearing on his conviction.

*Id.* at 4-5.

At trial, Ayako Chan-Hosokawa, a forensic toxicologist at NMS Labs, testified for the Commonwealth. *Id.* at 2.

Ms. Chan-Hosokawa testified that she prepared a toxicology report … regarding [Appellant's] blood sample. The parties stipulated to the chain of custody of [Appellant's] blood, to the authenticity of the report, and to the testing on the blood sample. In regard to [Appellant's] blood sample, Ms. Chan-Hosokawa testified [that] … [s]he found amphetamine at a concentration of 230 plus or minus 50 nanograms per milliliter in [Appellant's] blood[.]

*Id.* at 3 (citations to record omitted). She further stated:

100 nanograms per milliliter is the most common observation in the blood when somebody gets prescription amphetamines[.] …

While she has seen someone prescribed enough amphetamine to get the level [Appellant] had in his blood, if someone [was] not prescribed that much or if somebody [was] overusing that medication, some of the symptoms of impairment would be agitation, fast speech, even maybe hallucinogenic type of behavior. Moreover, Ms. Chan-Hosokawa testified that simply because a particular drug that can cause impairment is being prescribed and used at a therapeutic level does not lead to the conclusion that therefore no impairment can occur as a result of the use of that drug at that level.

*Id.* at 5 (some paragraph breaks omitted).

Ms. Chan-Hosokawa explained:

Amphetamine is a stimulant[.] Some signs of impairment that you would see with someone under the influence of amphetamine are agitation, hallucination, fast speech, and maybe poor balance[.] … After listening to the testimony and watching the DVD that was played in [c]ourt[,] which showed [Appellant's] field sobriety tests, she testified that [Appellant's] actions were consistent with impairment as a result of amphetamine use, including: [Appellant's] speeding; [Appellant's] weaving; [Appellant's] switching lanes without signaling; [Appellant's] poor balance; [Appellant's] agitated speech; and [Appellant's] hallucinogenic behavior like having someone following him.

*Id.* at 3 (citations to record and paragraph breaks omitted). The trial court found Ms. Chan-Hosokawa's testimony to be credible. *Id.*

The trial court also found Trooper Knickel's testimony regarding Appellant's behavior on the date of the incident credible and in direct contrast to Dr. Guzzardi's assertion that there is no evidence indicating Appellant's use of amphetamines caused any impairments that would be significant enough

to affect his ability to safely drive a motor vehicle. *Id.* at 8.[2]  Specifically, the

trial court relied on the following testimony:

> [Trooper Knickel] saw [Appellant's] vehicle jut to the side and then come back over; he observed the vehicle swerving all over the roadway; he saw the vehicle go across both lanes of traffic and then cut back across both lanes of traffic onto the shoulder, and then back onto the roadway; [Appellant's] vehicle accelerated up to 92 miles per hour in a 55 miles per hour zone; there were a few times where the vehicle left its lane, came back into its lane, and went onto the shoulder of the roadway; and at no point did [Appellant] signal for a lane change when doing so.

*Id.* (paragraph breaks, bullet points, unnecessary capitalization, and citation

to record omitted).

> Trooper Knickel further observed:
>
> [Appellant] was very jittery, all over the place, very talkative, and hard to follow; [he] exhibited some paranoia; when [Appellant] got out of the car, he was very uncoordinated, unsure of his footing, and his movements in general were very uncoordinated; and when [he] stopped his vehicle, he did not place the vehicle in park and had to be told to do so.

*Id.* at 9 (paragraph breaks, bullet points, unnecessary capitalization, and

citation to record omitted).

Regarding the field sobriety tests Appellant was asked to perform,

Trooper Knickel testified:

> The road where [Appellant] was asked to perform these tests was a very flat, paved road[.]  It was not raining and there were no

---

[2] *See also id.* (noting that Trooper Knickel has been with the State Police for four and a half years; has been trained in regard to impaired drivers and Advanced Roadside Impaired Driving Enforcement ("ARIDE"); is certified in administering standard field sobriety tests; and has been involved in approximately 300-400 DUI investigations).

other adverse weather conditions that night[.] During the Modified Romberg test[, Appellant] swayed a little from side to side or forward to backwards … [and his] estimation of 30 seconds was actually around 20 seconds. During the walk and turn test[, Appellant] could not maintain the instructional phase and left that position a couple of times[. He] used his hands for balance[,] and Trooper Nickel [*sic*] had to stop the test when [Appellant] started to begin it because he was having such a difficult time and the Trooper did not want him to get hurt. In regard to the one-leg stand test[, Appellant] was using his arms and having an extremely difficult time[. Appellant] put his foot down[] and was hopping, trying not to fall over[. He] did not perform the test as instructed[. Appellant's] hands were in front of him instead of at his sides[.] At the conclusion of these tests, Trooper Knickel told [Appellant] that he believed him to be impaired.

*Id.* at 9-10 (paragraph breaks, bullet points, unnecessary capitalization, and citation to record omitted).

Finally, regarding Dr. Guzzardi's claim that field sobriety tests have not been validated to test for impairment by drugs, the trial court noted that Dr. Guzzardi is an expert in the field of medical toxicology, *not* forensic toxicology. *Id.* at 5-6. It further stated that even if Dr. Guzzardi's contention is true, field sobriety tests continue to be used in DUI cases as evidence of impairment. Moreover, "it is common knowledge that field sobriety tests are used to assess an individual's motor skills and divided attention necessary for driving a motor vehicle." *Id.* at 6. *See also Commonwealth v. Griffith*, 32 A.3d 1231, 1240 (Pa. 2011) (concluding that an experienced police officer's observation of the appellee's "behavior, demeanor, unsteadiness, and inability to perform field sobriety tests, all of which led him to request laboratory tests for the detection of controlled substances in [the a]ppellee's blood[,]" was sufficient

evidence to establish that the appellee was under the influence of a drug or combination of drugs to a degree that impaired her ability to safely drive).

It is undisputed that Appellant had amphetamine in his system in the amount specified by Ms. Chan-Hosokawa. TCO at 6. Based on this fact, along with the testimony of Trooper Knickel and Ms. Chan-Hosokawa, and what could be seen on the motor video recording, the trial court concluded that the Commonwealth proved beyond a reasonable doubt that Appellant was driving impaired as a result of those amphetamines. ***Id.***

Assessing all the evidence according to the governing principles cited above, we simply cannot conclude that the trial court abused its discretion when it found that the verdict did not shock its conscience and denied Appellant's motion for a new trial. Consequently, Appellant's weight challenge fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/09/2023